## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER LOCKE,** | § | |
| **SHANE LEETH,** | § | |
| **MATTHEW PETERS, and** | § | |
| **COLLIN NICODEMUS,** | § | |
|     *Plaintiffs,* | § | 420cv683 |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:20-cv-363** |
| | § | |
| **KYLE THOMAS,** | § | |
| **In his individual capacity,** | § | |
| **COLLIN COUNTY, TEXAS,** | § | |
| **STEPHANIE DUNN,** | § | |
| **In her individual capacity,** | § | |
| **JAMIE COOK,** | § | |
| **In his individual capacity,** | § | |
| **BRYCE THOMPSON,** | § | |
| **In his individual capacity,** | § | |
| **MICKEY FRIZELL,** | § | |
| **In his individual capacity, and** | § | |
| **KRYSTAL CAMP,** | § | |
| **In her individual capacity,** | § | |
| **SOUTHWEST CORRECTIONS** | § | |
| **MEDICAL GROUP, INC.,** | § | |
|     *Defendants.* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER
Texas Bar No. 00797196
JAMES P. ROBERTS
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Henderson Parkway,
Suite 540, LB 32
Addison, Texas 75001
Tel: (214) 987-4100
Fax: (214) 922-9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

ATTORNEYS FOR PLAINTIFFS

## **Table of Contents**

Table of Authorities...............................................................................................................3

 I. Parties...............................................................................................................................5

II. Jurisdiction and Venue .....................................................................................................6

III. Facts and Allegations ......................................................................................................7

IV. Causes of Action ........................................................................................................... 21

    COUNT I – SEXUAL BATTERY/EXCESSIVE FORCE ........................................ 21

    COUNT II – FAILURE TO PROTECT ................................................................... 22

    COUNT III – FAILURE TO SUPERVISE .............................................................. 27

    COUNT IV – EXCESSIVE FORCE........................................................................ 33

    COUNT V – DELIBERATE INDIFFERENCE TO MEDICAL NEEDS........................ 35

    COUNT VI –PRACTICE AND CUSTOM OF RETALIATION ..................................38

V. Exemplary Damages. .....................................................................................................44

VI. Damages ......................................................................................................................44

VII. Attorney's Fees. ...........................................................................................................45

VIII. Jury Request. ..............................................................................................................45

Prayer.................................................................................................................................45

## Table of Authorities

**CASES**

*Adames v. Perez,*
  331 F.3d 508, 512 (5th Cir. 2003) ................................................................... 23

*Alderson v. Concordia Par. Corr. Facility,*
  848 F.3d 415, 422 n.8. (5th Cir. 2017)........................................................... 35

*Bell v. Wolfish,*
  441 U.S. 520, 535, 545 (1979) ........................................................................ 22

*Cantu v. Jones,*
  293 F.3d 839, 844 (5th Cir. 2002)................................................................... 22

*Easter v. Powell,*
  467 F.3d 459, 461–65 (5th Cir. 2006) ........................................................... 35

*Farmer v. Brennan,*
  511 U.S. 825, 833 (1994) ......................................................................... 22, 23

*Galvan v. Calhoun Cty.,*
  719 F. App'x 372 (5th Cir. 2018) .................................................................... 35

*Goodman v. Harris Cty.,*
  571 F.3d 388, 395 (5th Cir. 2009).......................................................... passim

*Hampton Co. Nat'l Sur., LLC v. Tunica Cty.,*
  543 F.3d 221, 224 (5th Cir. 2008) .................................................................. 38

*Hare v. City of Corinth,*
  74 F.3d 633, 639 (5th Cir. 1996) ............................................................. 22, 23

*Harris v. Hegmann,*
  198 F.3d 153, 159–60 (5th Cir. 1999)............................................................. 35

*Hicks–Fields v. Harris Cty.,*
  860 F.3d 803, 808 (5th Cir. 2017)............................................................ 39, 40

*Jones v. Greninger,*
  188 F.3d 322, 324–25 (5th Cir. 1999)............................................................. 40

*Kingsley v. Hendrickson,*
  135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015) ..................................... 21, 33

*Malone v. City of Fort Worth,*
  297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) ................................................... 40

*Monell v. Dep't of Social Servs.*,
    436 U.S. 658, 690–91 (1978) .......................................................................... 39

*Pena v. City of Rio Grande City*,
    879 F.3d 613, 623 (5th Cir. 2018) ................................................................. 39

*Piotrowski v. City of Houston*,
    237 F.3d 567, 578 (5th Cir. 2001) ................................................................. 39

*Rodriguez v. Bexar County*,
    2018 WL 4431433 ............................................................................................ 36

*Smith v. Brenoettsy*,
    158 F.3d 908, 911–12 (5th Cir.1998)......................................................passim

*Webster v. City of Houston*,
    735 F.2d 838, 841 (5th Cir.1984) .................................................................. 39

*Woods v. Smith*,
    60 F.3d 1161, 1166 (5th Cir.1995)................................................................. 40

*Zarnow v. City of Wichita Falls, Tex.*,
    614 F.3d 161, 166 (5th Cir. 2010) ................................................................ 39

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, CHRISTOPHER LOCKE, SHANE LEETH, MATTHEW PETERS, AND COLLIN NICODEMUS, Plaintiffs, complaining of KYLE THOMAS, in his individual capacity, COLLIN COUNTY, TEXAS, STEPHANIE DUNN, in her individual capacity, JAMIE COOK, in his individual capacity, BRYCE THOMPSON, in his individual capacity, MICKEY FRIZELL, in his individual capacity, and KRYSTAL CAMP, in her individual capacity, and SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC., and for causes of action will respectfully show unto the Court as follows:

## I.
## <u>Parties</u>

1.      Plaintiff Collin Nicodemus is an individual residing in Lewisville, Denton County, Texas.

2.      Plaintiff Christopher Locke is an inmate in the Denton County Jail.

3.      Plaintiff Shane Leeth is an inmate in the Hunt County Jail.

4.      Plaintiff Matthew Peters is an inmate in the Texas Department of Criminal Justice H. H. Coffield Unit in Anderson County, Texas.

5.      Defendant Kyle Thomas is an individual residing in Collin County, Texas, and may be served wherever he may be found. He is being sued in his individual capacity.

6.      Defendant Collin County, Texas is a political subdivision of the State of Texas located in the Eastern District of Texas. Collin County, Texas can be served through its County Judge, Chris Hill, at 2300 Bloomdale Rd., Suite 4192, McKinney, TX 75071, or wherever he may be found.

7.      Defendant Stephanie Dunn is an individual residing in Collin County, Texas, and may be served at her place of employment at the Collin County Sheriff's Office

located at 4300 Community Ave, McKinney, TX 75071 or wherever she may be found. She is being sued in her individual capacity.

8.      Defendant Jamie Cook is an individual residing in Collin County, Texas, and may be served at his place of employment at the Collin County Sheriff's Office located at 4300 Community Ave, McKinney, TX 75071 or wherever he may be found. He is being sued in his individual capacity.

9.      Defendant Bryce Thompson is an individual residing in Collin County, Texas, and may be served at his place of employment at the Collin County Sheriff's Office located at 4300 Community Ave, McKinney, TX 75071 or wherever he may be found. He is being sued in his individual capacity.

10.      Defendant Mickey Frizell is an individual residing in Collin County, Texas, and may be served at his place of employment at the Collin County Sheriff's Office located at 4300 Community Ave, McKinney, TX 75071 or wherever he may be found. He is being sued in his individual capacity.

11.      Defendant Krystal Camp is an individual residing in Collin County, Texas, and may be served at her place of employment at the Collin County Sheriff's Office located at 4300 Community Ave, McKinney, TX 75071 or wherever she may be found. She is being sued in her individual capacity.

12.      Defendant Southwest Correctional Medical Group, Inc., is a is a is a third-party medical company providing medical services for the Collin County Jail and may be served at its corporate headquarters located at 1283 Murfreesboro Pike, Nashville, TN 37217.

## II.
## Jurisdiction and Venue

13.      The Court has original jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

14.    Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the Eastern District of Texas, and all or a substantial part of the cause of action accrued in the Eastern District of Texas.

### III.
### Facts and Allegations

15.    At all times relevant to this lawsuit, Plaintiffs Christopher Locke, Shane Leeth, Marcus Peters, and Collin Nicodemus were being held as pre-trial detainees in the Collin County jail.

16.    At all times relevant to this lawsuit, Defendant Kyle Thomas ("Thomas") was an employee of Collin County responsible for supervising inmates, such as Plaintiffs in this case.

17.    At all times relevant to this lawsuit, Defendant Jamie Cook ("Cook") was an employee of Collin County responsible for supervising other Collin County employees, such as Defendant Thomas in this case.

18.    At all times relevant to this lawsuit, Defendant Stephanie Dunn ("Dunn") was an employee of Collin County working in the kitchen with Cook and Thomas.

19.    Collin County is responsible for protecting inmates in the Collin County jail.

**Collin County was on Notice that Kyle Thomas was a Danger to Inmates**

20.    Thomas was a supervisor in the kitchen of the Collin County jail.

21.    In February of 2018, Chase Chandler ("Chandler") was an inmate in the Collin County jail.

22.    Chandler worked in the kitchen where Thomas was in charge.

23.     Thomas would ask inmates not to wear boxer shorts under their uniforms and would grope the inmates.

24.     On February 25, 2018, Chandler bonded out of jail.

25.     Thomas contacted Chandler on a dating app called Grinder.

26.     Thomas knew Chandler from the jail.

27.     Thomas knew that it was against Collin County policy for Thomas to have a relationship with an inmate he met in the jail.

28.     Chandler and Thomas spent time together after connecting on Grinder.

29.     Thomas was aware that he was violating Collin County policy.

30.     On March 12, 2018, Chandler went back into custody at the Collin County jail.

31.     Chandler wanted to work in the kitchen again but was not allowed to do so.

32.     Chandler saw a sticky note on the kitchen officer's computer that said "do not let Inmate Chandler volunteer for kitchen."

33.     Chandler asked Dunn, why he was not allowed to work in the kitchen anymore.

34.     Dunn responded, "you know why, because you have a big mouth."

35.     Chandler had told some of the other inmates that he met up with Thomas while he was out of custody.

36.     The only thing that changed between Chandler being allowed to work in the kitchen and Chandler being prohibited from working in the kitchen was Thomas meeting up with Chandler over Grinder while Chandler was out of custody for two weeks.

37.     Upon information and belief, Chandler was not allowed to work in the kitchen during his incarceration which started on March 12, 2018, because Collin County officials became aware of his relationship with Thomas.

38.     Thomas then disclosed to other inmates some private personal health information regarding Chandler that Thomas learned when he met up with Chandler after meeting on Grinder.

39.     Chandler wrote a grievance regarding Thomas due to HIPPA violations.

40.     Chandler went to Defendant Captain Bryce Thompson ("Thompson") and discussed Thomas revealing this private information to other inmates and Thompson told Chandler he would look into the situation.

41.     Cook told Chandler that Cook would talk to Thomas regarding the HIPPA issue.

42.     Thus, both Thompson and Cook were aware of Thomas meeting up with Chandler in violation of Collin County policy.

43.     Additionally, both Thompson and Cook were aware of Thomas causing damage to Chandler's reputation by violating HIPPA as a result of Thomas and Chandler meeting up in violation of Collin County policy.

44.     Both Thompson and Cook were aware that Thomas was willing to violate Collin County policy by engaging in an inappropriate relationship with inmates.

45.     However, Thomas was not terminated or required to have supervision while alone with inmates.

46.     This was true despite the fact that both Thompson and Cook were aware that Thomas was also willing to use information gained during these inappropriate relationships with inmates to harm the inmates.

47.     Both Thompson and Cook were aware of this information and did nothing to prevent further harm to future inmates prior to the following events involving Locke, Leeth, Peters, and Nicodemus.

48.     Had Thompson or Cook taken steps to ensure Thomas would not be able to harm other inmates, the following events involving Locke, Leeth, Peters, and Nicodemus would not have occurred.

49.     Upon information and belief, there have been multiple grievances by inmates filed regarding Thomas prior to the events that form the basis of this suit.

50.     Leeth spoke with another inmate in the Collin County jail who had worked B-shift kitchen for over seven months.

51.     This inmate instructed Thomas not to touch or harass him.

52.     This inmate saw multiple people write grievances on Thomas.

53.     Upon information and belief, Cook was aware of these grievances and did nothing to prevent Thomas from continuing to harass future inmates.

### Thomas Touched Nicodemus in the Kitchen

54.     In May 2018, Nicodemus became a trustee working in the kitchen under the supervision of Thomas.

55.     When Nicodemus found out he was going to be in the kitchen he was told to watch out for Thomas.

56.     It was a well-known fact that Thomas made inappropriate and sexual gestures and comments to inmates and that he physically touched inmates in the kitchen.

57.     Nicodemus found out he was going to be on A-shift, which was when Thomas worked.

58.     Nicodemus was in the kitchen putting packets of jellies on trays.

59.    Thomas came up behind Nicodemus on his right side and pressed Thomas' clothed penis up against Nicodemus' back.

60.    Thomas then said, "no put it in this spot" and grabbed Nicodemus' arm to guide where to put the jelly packets.

61.    It was clearly not an accident as Thomas was on the other side of the line and could have pointed or told Nicodemus where to put the jelly without touching him.

62.    Thomas intentionally walked around the line, got behind Nicodemus, and pressed against him.

63.    It was his first day as an inmate worker and he didn't want to make his time any worse than it had to be.

64.    Nicodemus didn't say anything at the time, but was scared, embarrassed, and ashamed.

65.    A day or two later, Nicodemus was cracking eggs in the kitchen.

66.    Nicodemus saw Thomas and became extremely nervous.

67.    Thomas told Nicodemus he "liked the way [Nicodemus] fondled the eggs."

68.    Nicodemus just went back to cracking the eggs.

69.    This again made Nicodemus feel uncomfortable and scared for what was going to happen while he was in custody working in the kitchen.

70.    Later in May of 2018, Nicodemus went into the back of the kitchen to get his rubber boots.

71.    Thomas was coming out of the freezer.

72.    Thomas was holding the door open.

73.    Thomas put his hand out to stop Nicodemus.

74.    Thomas touched Nicodemus' penis over his pants.

75.    As Nicodemus was walking up, Thomas extended his arm in front of Nicodemus' crotch.

76.    Thomas had his hand open and cupped around Nicodemus' penis.

77.    Nicodemus backed up and said "whoa."

78.    Someone else walked up with the big cart with all the food to prepare for lunch and dinner.

79.    Thomas continued holding the door open.

80.    Nicodemus walked out after the cart went by.

81.    Nicodemus didn't think that anyone would believe him in the jail and was scared of being retaliated against by the jail.

82.    However, Nicodemus filed multiple requests and grievances regarding the situation.

83.    Nicodemus was called out by investigators to talk about Thomas.

84.    The same day that Nicodemus came back from talking to the investigators, he was again going to get his rubber boots from the back of the kitchen.

85.    Thomas asked Nicodemus to help him get something out of dry storage.

86.    Nicodemus went into dry storage.

87.    Thomas told Nicodemus that he brought him back there to "handle him."

88.    This statement by Thomas was clearly sexual in nature and made Nicodemus feel extremely uncomfortable and scared.

89.    Nicodemus had already filed a complaint about Thomas but was still being put in these situations with him.

90.    Nicodemus picked up a crate of food and walked out of dry storage.

91.     Following all of these incidents, Nicodemus was too afraid to continue working in such a hostile environment with Thomas.

92.     Nicodemus made complaints and even spoke to investigators, but nothing was being done regarding Thomas.

93.     Lieutenant Barnett told Nicodemus he was being removed from inmate working for not going to work in the kitchen.

94.     Nicodemus told him he didn't feel comfortable working in the kitchen due to Thomas and that Nicodemus was involved in the investigation into Thomas.

95.     Barnett told Nicodemus he wasn't involved in the investigation and that Nicodemus better be at work or he was going to be removed.

96.     Barnett told Nicodemus he would personally remove him if he didn't go back to the kitchen.

97.     After Nicodemus complained about Thomas to jail officials, Nicodemus was removed from the kitchen.

98.     Nicodemus was sent to Laundry – a less desirable trustee placement due to shift hours and duties.

99.     Nicodemus was harassed by jailers.

100.    Nicodemus was searched much more frequently than prior to making his complaint about Thomas.

101.    Officer Farey would search Nicodemus every time he saw him in the hallway. This required Nicodemus to refold each piece of laundry that he was moving and that Farey had just unfolded.

102.    Nicodemus asked Farey if he had a problem with Nicodemus and Farey responded that he had a problem with people who were lying.

103.    The only thing Farey could have been referring to is the complaint Nicodemus made about Thomas.

## **Thomas Touched Peters in the Kitchen**

104.    Peters went to the trustee pod in early May 2018.

105.    Peters was given a job in the kitchen where Thomas worked.

106.    Peters was nicknamed Worm.

107.    Thomas would have Peters go into the pantry

108.    Thomas asked Peters if he was nicknamed Worm because of the size of his penis.

109.    Thomas asked to see Peters' penis.

110.    While in the pantry, Thomas asked to see Peters' penis and if Thomas could give him oral sex.

111.    Peters declined as respectfully as he could as he did not want Thomas to kick Peters out of trustee.

112.    In the kitchen's office, Thomas pulled Peters' information up on the computer.

113.    Thomas told Peters that he is a legal assistant and can help get Peters bonded out. Thomas was implying that if Peters did something for Thomas then Thomas would do something for Peters.

114.    Another time in the pantry, Thomas brushed up against Peters and grab Peters' backside.

115.    On another occasion, Thomas had Peters grab a pan of eggs to put in the walk-in cooler in front of the ovens.

116.    Thomas and Peters were only people in the cooler.

117.    Thomas grabbed Peters by his penis over his clothes.

118.    Thomas grabbed ahold and Peters had to jerk back to get Thomas to let go.

119.    Peters jumped back and said don't do that.

120.    Thomas laughed and asked why not.

121.    Peters then left the walk-in cooler.

122.    There were other people working in the kitchen that day; however, Peters did not tell anyone in the kitchen because he was embarrassed and ashamed.

## Thomas Touched Leeth in the Kitchen

123.    In May of 2018, Leeth was working in the kitchen at the Collin County jail.

124.    On his third day working in the kitchen, Leeth went into the office to find out what his job assignment would be that day.

125.    Leeth and Thomas were the only two people in the office.

126.    Thomas got up and walked around Leeth was asking for a hat to wear in the kitchen.

127.    Thomas pointed behind Leeth, instructing him where the hats were located.

128.    Thomas kept walking by Leeth and groped Leeth's crotch with his left hand.

129.    Thomas rubbed Leeth's penis over his pants.

130.    Leeth took two steps back to get away from Thomas.

131.    Thomas stood in the doorway and looked at Leeth.

132.    Leeth grabbed a hat and asked to get by Thomas.

133.    Thomas then moved out of the way and Leeth went to do the dishes.

134.    Leeth was so uncomfortable that he lied and said he had Hepatitis C so he wouldn't have to work in the kitchen anymore.

135.    Leeth does not have Hepatitis C.

136.     After complaining to jail officials about Thomas, Leeth was moved to the jobs of Floors and then Trash Porter - less desirable trustee placements due to shift hours and duties.

137.     Leeth was really embarrassed about what happened and suffered mental anguish as a result.

### **Thomas Touched Locke in the Kitchen**

138.     In May 2018, Locke was working in the kitchen

139.     Locke was volunteering on A-shift even though he was assigned to B-shift.

140.     Thomas and a couple of the guards would call Locke into A-shift because he was a hard worker.

141.     Thomas started calling Locke in on the days Thomas was by himself.

142.     Locke's B-shift boss was fired.

143.     Thomas started working both A-shift and B-shift.

144.     Locke was the main cook and interacted with all the bosses.

145.     Locke would have to go into the office to ask Thomas if he could go into dry storage.

146.     Thomas started staring at Locke's crotch.

147.     Thomas asked Locke a couple of times if "that was all [Locke] was working with."

148.     Thomas started opening the door and stand in between Locke and the door, making it harder for Locke to get by without touching Thomas.

149.     Locke started not going into work when Thomas was working.

150.     Thomas started getting rude with Locke and blaming Locke when other inmates made mistakes or took food.

151.   One day in May of 2018, Locke was called into A-shift by Thomas.

152.   Locke went into the dry storage area to get sugar.

153.   Thomas was at the door as Locke was walking out of dry storage.

154.   Thomas grabbed Locke's penis over the pants.

155.   Thomas placed his fingers on both sides of Locke's penis and rubbed from the top downward.

156.   Locke just kept walking.

157.   Locke was scared and felt ashamed and embarrassed.

158.   On June 4, 2018, Locke wrote an anonymous letter to the Captain regarding Thomas' conduct.

159.   Following that letter, an investigation ensued.

160.   After complaining about Thomas to Jail officials, Locke was removed from the kitchen.

161.   Locke was sent to Floors – a less desirable trustee placement due to shift hours and duties.

162.   As part of that investigation, Locke took a polygraph regarding Thomas touching him in the kitchen.

163.   Locke passed the polygraph as what he said happened was the truth.

164.   On August 1, 2018, Thomas was arrested on four counts of violating the civil rights of a person in custody.

### Peters was Assaulted in Retaliation for Thomas' Arrest

165.   Following Thomas' arrest, news travelled around the jail about what had been going on with Thomas in the kitchen.

166.    Officers began harassing Peters on a regular basis in retaliation for reporting Thomas' illegal conduct.

167.    On or about August 17, 2018, Defendant Lieutenant Mickey Frizell told Peters he was going to be moved to segregation.

168.    Peters was in Cluster 4 by D-pod.

169.    Frizell restrained Peters in shackles with both his hands and ankles restrained.

170.    Frizell tightened the cuffs on Peters' wrists and ankles so tight that the circulation as being cut off and his wrists and hands were turning white.

171.    The cuffs were causing unnecessary pain to Peters' hands and feet.

172.    Peters told Frizell that the cuffs were too tight.

173.    In response, Frizell tightened the cuffs even more.

174.    Frizell then began escorting the fully restrained Peters to cluster 1, A-pod.

175.    Peters had difficulty moving due to the pain he was in with the cuffs being too tight.

176.    Peters asked Frizell and his escorting officer multiple times to loosen the cuffs.

177.    Each time, Frizell told Peters to "shut the fuck up" and if Peters didn't shut up then he was "going to get it."

178.    The cuffs were so tight that they were cutting into Peters' skin.

179.    In the main hallway, Peters told Frizell he was bleeding.

180.    Frizell again told Peters to shut up.

181.    Peters turned to look at Frizell to again tell him how much pain he was in and Frizell slammed Peters against the wall.

182.    When Frizell slammed the fully restrained Peters into the wall, Peters' head struck the wall causing extreme pain.

183.    Frizell then slammed the fully restrained Peters onto the hard tile floor.

184.    Frizell then twisted Peters and got on top of him holding him down.

185.    Due to how tight Frizell had made the cuffs and restraints, this caused even more pain to Peters.

186.    Peters was now bleeding from both wrists, ankles, his head, and his elbow.

187.    Peters had pain in his ribs from being slammed on his side and elbow by Frizell.

188.    Medical personnel brought a gurney to transport Peters to the medical unit.

189.    Defendant Nurse Krystal Camp ("Camp") told Frizell that Peters may have a head injury and that he needed stitches for the cut on his head.

190.    Thus, Camp was subjectively aware that Peters needed medical attention because she saw his injuries and even stated to Frizell that Peters needed stitches.

191.    Camp told Frizell that Peters needed to go to the Emergency Room because he sustained a head injury and was bleeding from his head.

192.    Knowing that Peters was injured and that Camp had just told him Peters needed stitches and needed to go to the Emergency Room, Frizell refused treatment and ordered Peters to be placed on a full restraint bed.

193.    Knowing that Peters sustained a head injury and needed stitches, Camp did not provide further medical care to Peters.

194.    Camp apologized to Peters for not giving him medical attention and told him she had to do what the jailers, in this situation Frizell, say for her to do.

195.    At all times relevant hereto Defendant Southwest Correctional Medical Group, Inc. was willfully a participant in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates.

196.    Camp was an employee of Southwest Correctional Medical Group, Inc., who was following the practices, policies, customs, and training of Southwest Correctional Medical Group, Inc. when she failed to provide medical care to Peters because Frizell, a non-medical Collin County employee, instructed her to do so.

197.    Medical personnel told Peters that when they got him off the restraint bed they would let him see a doctor.

198.    However, they never let Peters see a doctor.

199.    Peters asked for them to take pictures of his injuries.

200.    Medical personnel would not take pictures.

201.    Peters asked if he could file charges against Frizell.

202.    Collin County Sheriff's office employees just laughed.

203.    Lieutenant Crossland came into the medical unit, removed Peters from the restraint bed, and took him to segregation.

204.    Peters requested MHMR help and medical attention.

205.    However, he never received either.

206.    Collin County never gave Peters medical attention for his injuries.

207.    Peters still has pain in both hands from being assaulted by Frizell.

208.    Peters has a scar on the back of his head from being slammed against the wall by Frizell.

209.    The Defendants were at all times acting under the color of law.

## IV.
## Causes of Action

### COUNT I

**SEXUAL BATTERY/EXCESSIVE FORCE**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendant Thomas**

210.     Plaintiffs repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

211.     Acting under the color of law, Defendant Thomas deprived Plaintiffs of the rights and privileges secured to them by the Fourteenth Amendment to the United States Constitution and by other laws of the United States to be free from excessive force.

212.     Plaintiffs brings this cause of action pursuant to 42 U.S.C. § 1983.

213.     "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015).

214.     A pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable in order to demonstrate that it was excessive in violation of the Fourteenth Amendment's Due Process Clause. *Kingsley*, 135 S. Ct. at 2473.

215.     Thomas touched Nicodemus in an objectively unreasonable manner which was not related to any legitimate governmental objective.

216.     Thomas pressed his clothed penis against Nicodemus' back.

217.     Thomas, using his hand, cupped Nicodemus' penis over his pants.

218.     Thomas touched Peters in an objectively unreasonable manner which was not related to any legitimate governmental objective.

219.    Thomas grabbed Peters by his penis over his pants.

220.    Thomas touched Leeth in an objectively unreasonable manner which was not related to any legitimate governmental objective.

221.    Thomas rubbed Leeth's penis over his pants.

222.    Thomas touched Locke in an objectively unreasonable manner which was not related to any legitimate governmental objective.

223.    Thomas grabbed Locke's penis over the pants.

224.    Thomas placed his fingers on both sides of Locke's penis and rubbed from the top downward.

225.    As a direct, proximate, and foreseeable result of the Thomas' actions, Plaintiffs suffered injuries and damages, including, mental anguish, embarrassment, humiliation, and inconvenience all of which are common to victims of sexual assault.

## COUNT II

### FAILURE TO PROTECT
### Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983
### Defendants Dunn, Cook, and Thompson

226.    Plaintiffs repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

227.    The Fourteenth Amendment's Due Process Clause protects the rights of pretrial detainees. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

228.    Detention center officials have a duty, under the Fourteenth Amendment, to protect the detainees in their custody. *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)); *Bell v. Wolfish*, 441 U.S. 520, 535, 545 (1979) (pretrial detainees retain at least those constitutional rights prisoners enjoy).

229.    An official violates a detainee's constitutional rights if the official is deliberately indifferent to a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 847.

230.    As there is no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs, including protection from violence, a state jail official's constitutional liability to pretrial detainees for episodic acts or omissions should be measured by a standard of subjective deliberate indifference as enunciated by the Supreme Court in *Farmer*. *Hare*, 74 F.3d at 643 (5th Cir. 1996).

231.    A plaintiff must allege facts that show that the official knew of and disregarded an excessive risk to inmate health or safety; that the officer was both aware of facts from which he could infer that a substantial risk of serious harm exists and actually made that inference, and failed to take reasonable measures to abate the risk. *Farmer*, 511 U.S. at 842-45; *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003); *Hare*, 74 F.3d at 648.

232.    The requisite knowledge of substantial risk can be established through circumstantial evidence creating a rebuttable inference. *Farmer*, 511 U.S. at 842. Officials who are aware of general, obvious, substantial risks and do not take reasonable measures to abate them can be found liable. *Id*. at 844.

233.    On March 12, 2018, inmate Chase Chandler went into custody at the Collin County jail.

234.    Chandler wanted to work in the kitchen again but was not allowed to do so.

235.    Chandler saw a sticky note on the kitchen officer's computer that said "do not let Inmate Chandler volunteer for kitchen."

236.    Chandler asked Dunn, why he was not allowed to work in the kitchen anymore.

237.    Dunn responded, "you know why, because you have a big mouth."

238.    Chandler had told some of the other inmates that he met up with Thomas while he was out of custody.

239.    The only thing that changed between Chandler being allowed to work in the kitchen and Chandler being prohibited from working in the kitchen was Thomas meeting up with Chandler over Grinder while Chandler was out of custody for two weeks.

240.    Upon information and belief, Chandler was not allowed to work in the kitchen during his incarceration which started on March 12, 2018, because Collin County officials became aware of his relationship with Thomas.

241.    Upon information and belief, Dunn was aware that Chandler was not allowed to work in the kitchen during his incarceration which started on March 12, 2018 because of his relationship with Thomas.

242.    Upon information and belief, Chandler's relationship with Thomas is what Dunn was referring to when she responded, "you know why, because you have a big mouth."

243.    Thomas then disclosed to other inmates some private personal health information regarding Chandler that Thomas learned when he met up with Chandler after meeting on Grinder.

244.    Chandler wrote a grievance regarding Thomas due to HIPPA violations.

245.    Chandler went to Thompson and discussed Thomas revealing this private information, which Thomas learned when he and Chandler met up outside of the jail, to other inmates and Thompson told Chandler he would look into the situation.

246.    Cook told Chandler that Cook would talk to Thomas regarding the HIPPA issue.

247.    Thus, Dunn, Thompson, and Cook were all aware of Thomas meeting up with Chandler in violation of Collin County policy.

248.    Additionally, both Thompson and Cook were aware of Thomas causing damage to Chandler's reputation by violating HIPPA as a result of Thomas and Chandler meeting up in violation of Collin County policy.

249.    Dunn, Thompson, and Cook were all aware that Thomas was willing to violate Collin County policy by engaging in an inappropriate relationship with inmates.

250.    However, Thomas was not terminated or required to have supervision while alone with inmates.

251.    Upon information and belief, Thomas was not even disciplined for meeting up with Chandler outside of the jail.

252.    This was true despite the fact that both Thompson and Cook were aware that Thomas was also willing to use information gained during these inappropriate relationships with inmates to harm the inmates.

253.    Upon information and belief, there have been multiple grievances by inmates filed regarding Thomas prior to the events that form the basis of this suit.

254.    Leeth spoke with another inmate in the Collin County jail who had worked B-shift kitchen for over seven months.

255.    This inmate instructed Thomas not to touch or harass him.

256.    This inmate saw multiple people write grievances on Thomas.

257.    Upon information and belief, as co-worker and supervisor in the kitchen, Dunn and Cook were aware of these grievances and did nothing to prevent Thomas from continuing to harass and harm future inmates.

258.    Upon information and belief, as a Captain at the jail, Thompson was aware of these grievances and did nothing to prevent Thomas from continuing to harass and harm future inmates.

259.    Dunn, Thompson, and Cook were all aware of what Thomas had done and did nothing to prevent further harm to future inmates, including, Locke, Leeth, Peters, and Nicodemus.

260.    Had Dunn, Thompson, or Cook taken steps to ensure Thomas would not be able to harm other inmates, Locke, Leeth, Peters, and Nicodemus would not have been harmed by Thomas.

261.    Dunn's failed to take any steps to prevent Thomas from harming inmates, although she was Thomas's co-worker, as his co-worker had the ability and duty to take action to prevent Thomas from harming inmates, was aware that Thomas had an inappropriate relationship with an inmate, and was aware that Thomas was continuing to be alone with inmates without supervision.

262.    Dunn's failure to prevent Thomas from harming inmates directly caused the harm outlined in this lawsuit to Locke, Leeth, Peters, and Nicodemus.

263.    Cook failed to take any steps to prevent Thomas from harming inmates, although he was Thomas's supervisor, as his supervisor had the ability and authority to take action to prevent Thomas from harming inmates, was aware that Thomas had an inappropriate relationship with an inmate, was aware that as a result of that inappropriate relationship Thomas was disseminating Chandler's private personal health information,

was aware of multiple grievances filed against Thomas, and was aware that Thomas was continuing to be alone with inmates without supervision.

264.    Cook's failure to prevent Thomas from harming inmates directly caused the harm outlined in this lawsuit to Locke, Leeth, Peters, and Nicodemus.

265.    Thompson failed to take any steps to prevent Thomas from harming inmates, although he was a Captain at the jail and Thomas's ultimate supervisor, as Captain at the jail had the ability and authority to take action to prevent Thomas from harming inmates, was aware that Thomas had an inappropriate relationship with an inmate, was aware that as a result of that inappropriate relationship Thomas was disseminating Chandler's private personal health information, was aware of multiple grievances filed against Thomas, and was aware that Thomas was continuing to be alone with inmates without supervision.

266.    Thompson's failure to prevent Thomas from harming inmates directly caused the harm outlined in this lawsuit to Locke, Leeth, Peters, and Nicodemus.

267.    Defendants were at all times acting under the color of law.

## COUNT III

### FAILURE TO SUPERVISE
### Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983
### Defendants Cook and Thompson

268.    Plaintiffs repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

269.    In a § 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate

indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

270.    "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Smith*, 158 F.3d at 912.).

271.    In this case, Cook and Thompson failed to supervise Thomas.

272.    First, it is clear that Cook and Thompson were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

273.    On March 12, 2018, inmate Chase Chandler went into custody at the Collin County jail.

274.    Chandler wanted to work in the kitchen again but was not allowed to do so.

275.    Chandler saw a sticky note on the kitchen officer's computer that said "do not let Inmate Chandler volunteer for kitchen."

276.    Chandler asked Officer Stephanie Dunn, who was the officer in charge of the kitchen, why he was not allowed to work in the kitchen anymore.

277.    Dunn responded, "you know why, because you have a big mouth."

278.    Chandler had told some of the other inmates that he met up with Thomas while he was out of custody.

279.    The only thing that changed between Chandler being allowed to work in the kitchen and Chandler being prohibited from working in the kitchen was Thomas meeting up with Chandler over Grinder while Chandler was out of custody for two weeks.

280.    Upon information and belief, Chandler was not allowed to work in the kitchen during his incarceration which started on March 12, 2018, because Collin County officials became aware of his relationship with Thomas.

281.    Upon information and belief, Dunn was aware that Chandler was not allowed to work in the kitchen during his incarceration which started on March 12, 2018 because of his relationship with Thomas.

282.    Upon information and belief, Chandler's relationship with Thomas is what Dunn was referring to when she responded, "you know why, because you have a big mouth."

283.    Upon information and belief, Dunn was aware of why Chandler was not allowed to work in the kitchen because Cook, as her supervisor, told her.

284.    Thomas then disclosed to other inmates some private personal health information regarding Chandler that Thomas learned when he met up with Chandler after meeting on Grinder.

285.    Chandler wrote a grievance regarding Thomas due to HIPPA violations.

286.    Chandler went to Thompson and discussed Thomas revealing this private information, which Thomas learned when he and Chandler met up outside of the jail, to other inmates and Thompson told Chandler he would look into the situation.

287.    Officer Cook told Chandler that Cook would talk to Thomas regarding the HIPPA issue.

288.    Thus, Thompson and Cook were aware of Thomas meeting up with Chandler in violation of Collin County policy.

289.    Additionally, both Thompson and Cook were aware of Thomas causing damage to Chandler's reputation by violating HIPPA as a result of Thomas and Chandler meeting up in violation of Collin County policy.

290.    Thompson and Cook were aware that Thomas was willing to violate Collin County policy by engaging in an inappropriate relationship with inmates.

291.    Upon information and belief, there have been multiple grievances by inmates filed regarding Thomas prior to the events that form the basis of this suit.

292.    Leeth spoke with another inmate in the Collin County jail who had worked B-shift kitchen for over seven months.

293.    This inmate instructed Thomas not to touch or harass him.

294.    This inmate saw multiple people write grievances on Thomas.

295.    Upon information and belief, as supervisor in the kitchen, Cook was aware of these grievances and did nothing to prevent Thomas from continuing to harass and harm future inmates.

296.    Upon information and belief, as Captain at the jail, Thompson was aware of these grievances and did nothing to prevent Thomas from continuing to harass and harm future inmates.

297.    Thus, Cook and Thompson were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

298.    Second, it is clear Cook and Thompson actually drew the inference that a substantial risk of serious harm existed.

299.    It is clear they drew that inference because they prohibited Chandler from working in the kitchen with Thomas following Thomas and Chandler's inappropriate relationship.

300.    Thus, Cook and Thompson were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they also draw the inference." *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

301.    As a result, Cook and Thompson were deliberately indifferent in failing to supervise Thomas. *Id.*

302.    It is clear that Cook and Thompson failed to supervise Thomas.

303.    Thomas was not terminated or required to have supervision while alone with inmates.

304.    Upon information and belief, Thomas was not even disciplined for meeting up with Chandler outside of the jail.

305.    Thomas was still allowed to have unfettered access to inmates in the kitchen area.

306.    This unfettered access allowed Thomas to be alone with inmates without any supervision.

307.    This unfettered and unsupervised access to inmates allowed Thomas opportunities to harm inmates in secluded areas such as the kitchen office, the walk-in cooler, or the pantry.

308.    This was true despite the fact that both Thompson and Cook were aware that Thomas was also willing to use information gained during these inappropriate relationships with inmates to harm the inmates.

309.    Thompson and Cook were aware of what Thomas had done and did nothing to prevent further harm to future inmates, including, Locke, Leeth, Peters, and Nicodemus.

310.    Thus, Cook and Thompson failed to supervise Thomas although they were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they also draw the inference. *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

311.    As a result, their failure to supervise Thomas amounted to deliberate indifference. *Id.*

312.    Finally, there existed a causal link between Cook and Thompson's failure to supervise and the violation of the plaintiffs' rights. *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

313.    Had Thompson or Cook taken steps to ensure Thomas would not be able to harm other inmates, Locke, Leeth, Peters, and Nicodemus would not have been harmed by Thomas.

314.    Cook failed to take any steps to prevent Thomas from harming inmates, although he was Thomas's supervisor, as his supervisor had the ability and authority to take action to prevent Thomas from harming inmates, was aware that Thomas had an inappropriate relationship with an inmate, was aware that as a result of that inappropriate relationship Thomas was disseminating Chandler's private personal health information, was aware of multiple grievances filed against Thomas, and was aware that Thomas was continuing to be alone with inmates without supervision.

315.    Cook's failure to prevent Thomas from harming inmates directly caused the harm outlined in this lawsuit to Locke, Leeth, Peters, and Nicodemus.

316.    Thompson failed to take any steps to prevent Thomas from harming inmates, although he was Captain of the jail and Thomas's ultimate supervisor, as Captain of the jail had the ability and authority to take action to prevent Thomas from harming inmates, was aware that Thomas had an inappropriate relationship with an inmate, was aware that as a result of that inappropriate relationship Thomas was disseminating Chandler's private personal health information, was aware of multiple grievances filed against Thomas, and was aware that Thomas was continuing to be alone with inmates without supervision.

317.    Thompson's failure to prevent Thomas from harming inmates directly caused the harm outlined in this lawsuit to Locke, Leeth, Peters, and Nicodemus.

318.    As a result, (1) Cook and Thompson failed to supervise Thomas; (2) a causal link exists between the failure to supervise and the violation of the plaintiffs' rights; and (3) the failure to supervise amounts to deliberate indifference." *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d 911–12).

319.    Defendants were at all times acting under the color of law.

<u>COUNT IV</u>

**EXCESSIVE FORCE**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendant Frizell**

320.    Plaintiffs repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

321.    Under 42 U.S.C. § 1983, a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim. *Kingsley,* 135 S. Ct. at 2473.

322.    Acting under the color of law, Defendant Mickey Frizell deprived Peters of the rights and privileges secured to him by the Fourteenth Amendment to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of force.

323.    Peters brings this cause of action pursuant to 42 U.S.C. § 1983.

324.    The amount of force used by Frizell against Peters as described above, specifically but not limited to, when Frizell tightened Peters' shackles to the point of causing pain and then threw Peters into the wall and onto the ground, was objectively

unreasonable under the circumstances and inflicted unnecessary physical injury, pain, and suffering upon Plaintiff.

325.    A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

326.    Peters was fully restrained in shackles on his ankles and wrists when Frizell threw Peters into the wall and onto the ground.

327.    Peters was not threatening any officer or other person immediately prior to and at the time when Frizell tightened Peters' shackles to the point of causing pain and then threw Peters into the wall and onto the ground.

328.    Peters was not attempting to evade or resist arrest immediately prior to and at the time when Frizell tightened Peters' shackles to the point of causing pain and then threw Peters into the wall and onto the ground.

329.    A reasonable officer would know that the use of force is <u>clearly excessive</u> when engaging with citizens such as Peters, who was not threatening any officer or other person, was not attempting to evade or resist arrest at the time the force was used, and who the use of force was not warranted.

330.    A reasonable officer would know that the use of force is <u>clearly unreasonable</u> when engaging with citizens such as Peters, who was not threatening any officer or other person, was not attempting to evade or resist arrest at the time the force was used, and who the use of force was not warranted.

331.    A reasonable officer in Frizell's shoes would know that Frizell tightening Peters' shackles to the point of causing pain and then throwing Peters into the wall and onto the ground was clearly unreasonable and excessive.

332.    Tightening Peters' shackles to the point of causing pain and then throwing Peters into the wall and onto the ground served no legitimate governmental purpose.

333.    As a direct result of the force used against him by Frizell, Peters suffered physical injury, permanent physical disfigurement, pain, and mental anguish for which he sues herein.

334.    These injuries were not caused by any other means.

335.    Frizell was at all times acting under the color of law.

### COUNT V

**DELIBERATE INDIFFERENCE TO MEDICAL NEEDS**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendants Frizell, Camp, and Southwest Correctional Medical Group, Inc.**

336.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

337.    Pretrial Detainees must rely on jail authorities to treat their medical needs; therefore, the government has an obligation to provide medical care for those whom it is incarcerating.

338.    Peters had a constitutional right to medical care while incarcerated as a pretrial detainee under the 14th amendment.

339.    Refusing to treat a prisoner's complaints can give rise to Section 1983 liability. *Galvan v. Calhoun Cty.*, 719 F. App'x 372 (5th Cir. 2018); *Easter v. Powell*, 467 F.3d 459, 461–65 (5th Cir. 2006); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 n.8. (5th Cir. 2017).

340.    An episodic-acts-or-omissions claim faults specific jail officials for their acts or omissions.

341.    As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge." *Rodriguez v. Bexar County*, 2018 WL 4431433.

342.    Plaintiff must allege facts demonstrating subjective deliberate indifference, meaning that the Defendants both knew of and disregarded a substantial risk of serious harm.

343.    At all times relevant to the subject matter of this litigation, Defendant Southwest Correctional Medical Group, Inc. ("SCMG") acted under color of state law by providing medical services and care at the Collin County Jail pursuant to an agreement (or agreements) with Collin County.

344.    Frizell was subjectively aware that Peters was injured as Frizell is the person who tightened Peters' shackles, slammed Peters' head into the wall of the hallway, and then slammed Peters onto the ground.

345.    Frizell was aware that Peters was bleeding as Frizell could see the blood.

346.    Frizell was aware that Peters needed medical attention as Frizell summoned medical personnel to bring a gurney to transport Peters to the medical unit.

347.    Medical personnel brought a gurney to transport Peters to the medical unit.

348.    Defendant Nurse Krystal Camp ("Camp"), told Defendant Frizell that Peters may have a head injury and that he needed stitches for the cut on his head.

349.    Thus, Camp was subjectively aware that Peters needed medical attention because she saw his injuries and even stated to Frizell that Peters needed stitches.

350.    Camp told Frizell that Peters needed to go to the Emergency Room because he sustained a head injury and was bleeding from his head.

351.    Knowing that Peters was injured and that Camp had just told him Peters needed stitches and needed to go to the Emergency Room, Frizell refused treatment and ordered Peters to be placed on a full restraint bed.

352.    Knowing that Peters sustained a head injury and needed stitches, Camp did not provide further medical care to Peters.

353.    Camp apologized to Peters for not giving him medical attention and told him she had to do what the jailers, in this situation Frizell, say for her to do.

354.    At all times relevant hereto SCMG was willfully a participant in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates.

355.    Camp was an employee of SCMG, who was following practices, policies, customs, and training of SCMG.

356.    SCMG was deliberately indifferent when it failed to properly train and supervise their employees, such as Camp, to provide necessary medical care to detainees at the Collin County Jail.

357.    SCMG was deliberately indifferent when it maintained a policy where its employees, such as Camp, were allowed to deny necessary medical care to detainees at the Collin County Jail, such as Peters, upon instruction by non-medical Collin County deputies, such as Frizell in this case.

358.    Camp knowing that Peters needed medical attention and then apologizing to him because she had to do what Frizell told her to do regarding providing medical care demonstrates SCMG's unconstitutional and deliberately indifferent policy and training.

359.    SCMG's deliberately indifferent and unconstitutional policies, customs, practices, and/or training regarding provision of constitutionally adequate medical care

at the direction of non-medical Collin County personnel, as described, were the moving and proximate cause of Plaintiffs' injuries.

360.    Peters requested MHMR help and medical attention.

361.    However, he never received either.

362.    Collin County and SCMG never gave Peters medical attention for his injuries.

363.    Frizell and Camp knew that Peters needed medical attention but did not provide him with medical attention.

364.    Peters still has pain in both hands from being assaulted by Frizell.

365.    Peters has a scar on the back of his head from being slammed against the wall by Frizell and not receiving stitches or medical care.

366.    As a direct result of the Defendants failing to provide medical care and attention to Peters, Peters suffered physical injury, permanent physical disfigurement, pain, and mental anguish for which he sues herein.

367.    These injuries were not caused by any other means.

368.    The Defendants were at all times acting under the color of law.

## COUNT VI

**PRACTICE AND CUSTOM OF RETALIATION**
***Monell v. New York City Department of Social Services***
**Violation of the First and Fourteenth Amendments**
**Pursuant to 42 U.S.C § 1983**
**Defendant Collin County**

369.    Municipalities, including counties and cities, may be held liable under § 1983. *Hampton Co. Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008).

370.    A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978).

371.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

372.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

373.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

374.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

375.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown."

*Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

376.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities..." *Hicks–Fields*, 860 F.3d at 808.

377.    To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. *Jones v. Greninger*, 188 F.3d 322, 324–25 (5th Cir. 1999).

378.    "The inmate must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" Jones, 188 F.3d at 325 (quoting *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995)).

379.    The law of this circuit is clearly established that a prison official may not retaliate against or harass an inmate for complaining to a supervisor about a guard's misconduct. *Woods*, 60 F.3d at 1164 (see *Gibbs v. King*, 779 F.2d 1040, 1046 (5th Cir. 1986) ("A guard thus may not harass an inmate in retaliation for the inmate complaining to supervisors about the guard's conduct.").

380.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

## **Policymaker**

381.    The Sheriff is the chief law enforcement officer for Collin County and is responsible for running the jail.

382.   At all times relevant to this lawsuit, Jim Skinner was the Sheriff of Defendant Collin County.

383.   The Sheriff has been delegated as the policymaker for the sheriff's office and the jail by the Collin County Commissioner's Court.

384.   Collin County had constructive knowledge of the following unconstitutional custom and practice of retaliating against inmates because the policymaker, Sheriff Jim Skinner, would have been aware of the custom and practice had he properly exercised his responsibilities of running the jail.

## Custom and Practice Which was Moving Force of Constitutional Violations

385.   Collin County maintained an unconstitutional practice and custom of retaliating against inmates for complaining to supervisors about Collin County employee misconduct.

386.   (1) a specific constitutional right:

   a. Right to be free from punishment absent due process of law under the Fourteenth Amendment, and

   b. Freedom of Speech under the First Amendment.

387.   (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right (or, a chronology of events from which retaliation may plausibly be inferred) and (3) a retaliatory adverse act:

   a. Thomas had an improper relationship with Chase Chandler.

   b. The jail officials, including Dunn, Cook, and Thompson became aware of Thomas's improper relationship with Chandler.

   c. Chandler was prohibited from working as a trustee in the kitchen.

   d. Thomas inappropriately touched Nicodemus.

e.  Nicodemus complained about Thomas to jail officials.

f.  Nicodemus was removed from the kitchen.

g.  Nicodemus was sent to Laundry – a less desirable trustee placement due to shift hours and duties.

h.  Nicodemus was harassed by jailers.

i.  Nicodemus was searched much more frequently than prior to making his complaint about Thomas.

j.  Officer Farey would search Nicodemus every time he saw him in the hallway. This required Nicodemus to refold each piece of laundry that he was moving and that Farey had just unfolded.

k.  Nicodemus asked Farey if he had a problem with Nicodemus and Farey responded that he had a problem with people who were lying.

l.  The only thing Farey could have been referring to is the complaint Nicodemus made about Thomas.

m. Thomas inappropriately touched Locke.

n.  Locke complained about Thomas to jail officials.

o.  Locke was removed from the kitchen.

p.  Locke was sent to Floors – a less desirable trustee placement due to shift hours and duties.

q.  Thomas was inappropriately touched Peters.

r.  Peters complained about Thomas to jail officials.

s.  Peters was removed from the kitchen.

t.  Peters was harassed by jailers.

u.  Peters' cell was searched more frequently than prior to making his complaint about Thomas.

v.  Peters was assaulted by Frizell following his complaint about Thomas.

w.  After Frizell assaulted Peters, Officer Leonard came to see Peters and asked him if he believed he was being retaliated against, which Peters responded that he did believe that was why he was assaulted.

x.  Thomas improperly touched Leeth.

y.  Leeth complained about Thomas to jail officials.

z.  After complaining to jail officials about Thomas, Leeth was moved to the jobs of Floors and then Trash Porter - less desirable trustee placements due to shift hours and duties.

388.  (4) causation.

a.  The unconstitutional practice and custom of retaliating against inmates for complaining to supervisors about Collin County employee misconduct directly caused the injuries and harm to Plaintiffs in this case.

b.  Plaintiffs' constitutional rights were violated as they were punished for exercising their first amendment right to freedom of speech.

c.  As pre-trial detainees, Plaintiffs were punished in violation of their rights to substantive due process.

d.  Peters suffered physical harm as a result of this unconstitutional practice and custom as he was assaulted by Defendant Frizell.

## V.
## **Exemplary Damages**

389.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

390.    When viewed objectively from the standpoint of the Individual Defendants, at the time of the occurrence, the Individual Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

391.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by the Individual Defendants, Plaintiffs are entitled to recover exemplary damages in an amount within the jurisdictional limits of this Court.

## VI.
## **Damages**

392.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

393.    Plaintiffs' injuries were a foreseeable event. Those injuries were directly and proximately caused by Defendants actions and inactions outlined above in this lawsuit.

394.    As a result, Plaintiffs are entitled to recover all actual damages allowed by law. Plaintiffs contend the Individual Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Plaintiffs' constitutionally protected rights. Thus, Plaintiffs are entitled to punitive damages against the Individual Defendants.

395.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiffs were forced to suffer:

    a.    Physical injuries, pain, and suffering;

    b.    Permanent physical disfigurement; and

    c.    Emotional distress, torment, and mental anguish.

396.    Pursuant to 42 U.S.C. § 1983 and § 1988, and Texas Civil Practice & Remedies Code section 41.003(a), Plaintiffs seek to recover, and hereby request the award of exemplary damages, reasonable attorney's fees, and costs of court.

## VII.
## Attorney's Fees

397.    If Plaintiffs prevail in this action, by settlement or otherwise, Plaintiffs are entitled to and hereby demand attorney's fees under 42 U.S.C. § 1988.

## VIII.
## Jury Request

398.    Plaintiffs respectfully request a jury trial.

## Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this court. Plaintiffs further pray for all other relief, both legal and equitable, to which they may show themselves justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER
Texas Bar No. 00797196
JAMES P. ROBERTS
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Henderson Parkway,
Suite 540, LB 32
Addison, Texas 75001
Tel: (214) 987-4100
Fax: (214) 922-9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

ATTORNEYS FOR PLAINTIFFS